## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FLORIDA ROCK PROPERTIES, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**JEMAL'S BUZZARDS POINT L.L.C., et al.,**<br><br>Defendants. | **Civil Action No. 18-483 (JDB)** |

## MEMORANDUM OPINION

Plaintiff Florida Rock Properties, Inc. ("Florida Rock") owns and develops real estate (the "FRP Property") adjacent to a former bulk fuel distribution terminal (the "Fuel Terminal Property"). In 2018, Florida Rock brought this suit against former owners of the Fuel Terminal Property, defendants Hess Corporation and Jemal's Buzzards Point L.L.C., alleging that petroleum contamination from the Fuel Terminal Property had migrated onto the FRP Property. Defendants, in turn, brought indemnification and contribution claims against third-party defendants ExxonMobil, Steuart Investment Co., Superior Concrete Materials, Inc. d/b/a/ Opportunity Concrete Corp., Florida Rock Industries, Inc., and Vulcan Materials Co.

Defendants and third-party defendants ExxonMobil and Superior Concrete have now moved for summary judgment on statute-of-limitations grounds, arguing that Florida Rock's claims are time-barred. See Mem. of P. & A. in Supp. of Defs. Jemal's Buzzards Point L.L.C. & Hess Corp.'s Mot. for Summ. J. on Statute-of-Limitations Grounds ("Defs.' MSJ") [ECF No. 69-2] at 1, 16; Third-Party Def. ExxonMobil's Mot. for Summ. J. on Statute of Limitations [ECF No. 66] at 1; Third Party Def. Superior Concrete Materials, Inc.'s Mot. for Summ. J. on Statute of

Limitations [ECF No. 71] at 1.  Florida Rock opposes these motions.  See Pl.'s Resp. in Opp'n to Defs.' & Third-Party Defs.' Mots. for Summ. J. ("Opp'n Br.") [ECF No. 78] at 1.

For the reasons explained below, the Court will grant in part and deny in part these motions for summary judgment.  The Court concludes that Florida Rock's claims, insofar as they are based upon the continuous migration of contamination from the Fuel Terminal Property onto the FRP Property, accrued no later than February 2000 and are barred by the statute of limitations. However, under D.C. law, Florida Rock may still seek relief for any harm attributable to injurious acts within the limitations period immediately preceding the filing of this action.  Because the parties have not completed relevant fact discovery, including discovery regarding the migration of contamination from the Fuel Terminal Property, the Court will not decide at this stage whether defendants or third-party defendants committed injurious acts within the limitations period that caused injuries for which Florida Rock may seek damages or other forms of redress.

## BACKGROUND

The FRP Property is located in southeast Washington, D.C., just south of Nationals Park and north of the Anacostia River.  Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts & Counter-Statement of Genuine Issues of Material Facts ("RSOF") [ECF No. 78-2] ¶ 3. Immediately southwest of the FRP Property is the Fuel Terminal Property, where Hess operated a bulk petroleum storage facility from 1968 until approximately 1983, and from 1984 to 1985. RSOF ¶¶ 3, 67.  Before that, the Fuel Terminal Property was owned and operated by various predecessors of ExxonMobil dating back to 1924.  See Pl.'s Resp. to Third-Party Def. ExxonMobil Corp.'s Statement of Material Undisputed Facts & Counter-Statement of Genuine Issues of Material Fact [ECF No. 78-3] ¶ 3.

Florida Rock acquired the FRP Property from D.C. Materials in 1986 without performing any environmental due diligence.  RSOF ¶ 5.  At that time, the FRP Property was located in an industrial area and had a ready-mix concrete plant on site, as well as a 12,000-gallon diesel underground storage tank.  Id. ¶¶ 8–9.  By the mid-1990s, Florida Rock started to consider redeveloping the property and sought approval from zoning authorities for a mixed-use development.  Id. ¶ 11.  Through its development efforts, Florida Rock learned that the FRP Property was contaminated with petroleum products and their chemical components.  Id. ¶ 12.  The District of Columbia Department of Consumer and Regulatory Affairs, Underground Storage Tanks ("UST") Division, opened a Leaking Underground Storage Tank ("LUST") case for the FRP Property in 1995, which related to the 12,000-gallon diesel UST located on the eastern portion of the FRP Property.  Id. ¶¶ 14–15.

Florida Rock then contracted with Engineering Consulting Services, Ltd. ("ECS") to prepare a Phase I Environmental Site Assessment for the FRP Property.  See Phase I Environmental Site Assessment (Oct. 29, 1999) [ECF No. 69-20] at FRP026653–90.  ECS reported, in late 1999, that "a review of historical information (i.e. fire insurance maps) indicates that bulk underground and aboveground oil and gasoline storage has been present on the Amerada Hess Property since at least 1928 and are depicted to have been located near the western project site perimeter."  Id. at FRP026675.  ECS recommended "[p]erformance of a comprehensive subsurface exploration program (i.e. borings) to recover soil and ground water from various portions beneath the [FRP Property]" in order "to determine if the project site has been impacted."  Id.

In response, Florida Rock had ECS perform a Limited Phase II Environmental Site Assessment and Geographical Survey for the FRP Property.  RSOF ¶ 22. Dan Sullivan was the

Florida Rock employee responsible for interfacing with ECS, but he had no environmental expertise himself.  Id. ¶ 23; Tr. of Dep. of Paul D. Sullivan, Jr. [ECF No. 78-73] at 6:7–7:5, 241:4–24.  Before receiving the Phase II report, Sullivan spoke over the phone with an ECS employee twice in November 1999.  RSOF ¶ 24.  Sullivan's handwritten notes from those calls state that "[g]roundwater is impacted by petroleum," "[l]iabilities may involve both our own property and the Hess Oil property," and "[m]ost of the contamination is from Hess, and a little is from us. Some is from an unknown source."  Sullivan Phone Conversation Notes [ECF No. 69-9] at FRP028236–37.

The stated purpose of the Phase II assessment was to "[p]erform subsurface geoprobe explorations and a field sampling/laboratory testing program along the property boundaries adjacent to sites of potential environmental concern, and interior portions of the project site, to determine if any potential contaminants associated with the on-site and/or surrounding property use ha[d] impacted the subsoils and/or ground water beneath the project site."  See Limited Phase II Environmental Site Assessment & Geophysical Survey (Feb. 8, 2000) ("2000 Phase II Report") [ECF No. 69-7] at FRP026696.  ECS performed twenty geoprobes across the FRP Property, extending to depths ranging from 2 to 25 feet below ground.  Id. at FRP026701.  "Probes P-1 through P-6 were performed along the western property perimeter," which lies between the FRP Property and the Fuel Terminal Property.  Id.; RSOF ¶ 26.

ECS reported the results of its Phase II report to Dan Sullivan on February 8, 2000.  RSOF ¶ 22.  Of the twenty probes, a sheen was observed only on the surface of water samples collected from probes P-1 through P-6.  2000 Phase II Report at FRP026702.  Discolored soil (black staining) was detected at P-2 at a depth of 15 feet, and petroleum odors were noted during the collection of water samples from probes P-1 through P-6, P-13, P-17, and P-18.  Id.  The ground

water samples were analyzed for total petroleum hydrocarbons ("TPH") as well as diesel and

gasoline range organics ("DRO" and "GRO").  Id.  The report concluded that:

> On the basis of the results of the recent geoprobe evaluation and laboratory testing
> program performed along the western property perimeter, it appears that ground
> water and soils have been impacted from the current or former off-site petroleum
> storage (i.e. above and below-grade tanks) located on the Amerada Hess [Fuel
> Terminal] property.  The current and/or former tank fields appear to be situated in
> close proximity to the western property perimeter, with petroleum contamination
> migrating onto the project site due to the apparent upgradient location (probes P-1
> through P-6). . . .  Based on the field observations and the subsurface exploration,
> the contamination within the soils appears to be associated with ground water
> impacted zones, and does not appear to have migrated from above (i.e. surface spill).

Id. at RP026707.

The Phase II report went on to discuss the DRO and GRO concentrations in groundwater

in the vicinity of the former ready-mix concrete facility (probes P-13 and P-17), noting that the

contamination in this area may reflect the former use of petroleum products or spills in the vicinity

of the former concrete facility, "leaking of USTs or spills associated with the nearby Hess tank

field [on the Fuel Terminal Property]," upgradient and off-site migration of contaminants, or a

combination of contaminants from possible off-site sources to the north and west.  Id.

A letter from ECS to Florida Rock, dated March 23, 2000, outlined three options based on

the results of the Phase II report.  See Mar. 23, 2000 Letter Re: Recommendations Regarding

Results of the Limited Phase II Environmental Site Assessment ("Mar. 23, 2000 Letter") [ECF

No. 67-10] at DCM001796.  Option one was to "[b]uild a strong case" against an "off-site

responsible party" by conducting additional testing and hydrogeologic studies to determine ground

water flow directions and match on-site petroleum hydrocarbons with off-site sources.  Id.  ECS

noted that subsurface investigations and hydrogeologic studies present "considerable cost

considerations" and that "[t]here is no guarantee that these studies will identify a responsible party

beyond a reasonable doubt."  Id.  Option two was to present all data to the District of Columbia

and "[m]ake the assumption that there is enough data to substantiate the claim that the western and northern perimeter contaminants are from off-site sources." Id. Finally, option three was to "[d]iscontinue investigations" and "not present data to the District." Id. Florida Rock could "postpone investigation and reporting until definitive property usage is determined." Id.

At that time, in 2000, FRP decided not to conduct additional testing or otherwise attempt to identify the source of the contamination. See Tr. of Rule 30(b)(6) Dep. of Florida Rock Properties Inc. ("deVilliers Dep.") [ECF No. 78-44] at 44:25–45:8, 166:25–167:12, 235:3–20. Florida Rock made the "business decision" to delay further investigation in light of the speculative nature of ECS's assessment, the cost considerations, and the possibility that further testing could disrupt its lessee's operations. See id. at 166:25–167:12, 235:3–20; Opp'n Br. at 37. Instead of immediately investigating the matter, Florida Rock would identify sources of off-site contamination as part of its ongoing development of the property. See RSOF ¶ 50 (Response).

The District of Columbia, however, sent Florida Rock a directive letter in September 2001, requiring it to submit "a Comprehensive Site Assessment (CSA) to delineate the extent of soil contamination" and "a work plan indicating actions already taken and activities planned to address the soil and groundwater contamination (if necessary) at the site." Id. ¶ 52 (quotation omitted). Florida Rock's consultant, Schnabel Engineering Associates, P.C. ("Schnabel"), responded in October 2001 with a proposed work plan, but not with a work plan for a Comprehensive Site Assessment. Id. ¶¶ 53–55. Schnabel told the District that "[t]he owner understands that the site will require a [Comprehensive Site Assessment] and plans to perform one at later date." Id. ¶ 55 (quotation omitted). But over the next five years, Florida Rock never performed such an assessment. Id. ¶ 58. Meanwhile, in 2005, the Hess Corporation sold the Fuel Terminal Property to Jemal's Buzzards Point, LLC, id. ¶ 74, and in 2007, the USTs on the Fuel Terminal Property

were emptied and cleaned, see Underground Storage Tank Closure Assessment Report [ECF No. 78-27] at JEMAL-0021362–63.

In December 2006, the District again contacted Florida Rock, this time directing the company to install additional monitoring wells for site evaluation. RSOF ¶ 59. Schnabel submitted a work plan proposal, which was approved in April 2007 but never implemented. Id. ¶ 60. At the time, there was a "severe economic crisis," which had created "severe financing, sales, and leasing impediments." Zoning Comm'n Order No. 04-14A [ECF No. 78-52] at JEMAL-0024244, ¶¶ 5–7. In April 2009, Florida Rock received an email from a District of Columbia consultant disclosing a small portion of a September 2008 Environmental Site Assessment of the Florida Rock and Jemal's Buzzard Point properties that had been prepared for the District of Columbia Department of Transportation. See E-mail from Jon Whitney, HNTB Corp., to Lauren Caudill, Davis Buckley (Apr. 17, 2009) ("2009 Whitney Email") [ECF No. 78-59] at FRP025177–78. The limited portion of the report contained in the email to Florida Rock stated that three of the four soil samples taken from the western part of the FRP Property "were below the respective detection limit for the analyzed constituents," and "the concentrations were below the District of Columbia Leaking Underground Storage Tank (LUST) soil quality standard." See id.

In 2010, Schnabel submitted another work plan proposal, which was approved and—this time—implemented. RSOF ¶¶ 62–63. Schnabel produced a report of its findings in January 2011, which concluded that "the most likely origin of the contamination documented in this report is the gasoline pipelines formerly located along Half Street and Potomac Avenue or the petroleum storage tanks that formerly existed beneath the South Capitol Street Bridge." Matthew Ker & Jeffrey Nelson, P.E., Well Installation & Sampling Report at FRP02450 (Jan. 11, 2011) ("2011 Schnabel Report") [ECF No. 69-28] at FRP025459; see also Pl.'s Surreply in Opp'n to Defs.' Mot.

for Summ. J. ("Pl.'s Surreply") [ECF No. 99] at 4–5 (recognizing "petroleum storage tanks that formerly existed beneath the South Capitol Street Bridge" as a reference to the Fuel Terminal Property).[1]

A few years later, Florida Rock asked Schnabel to determine whether the Fuel Terminal Property was a possible source of contamination on the FRP Property, and on January 30, 2014, Schnabel responded.  See Letter from Jeffrey Nelson, PE, Schnabel Engineering Consultants, Inc., to David deVilliers, FRP (Jan. 30, 2014) [ECF No. 78-67] at FRP014884–85.  Schnabel reported that "[t]he available information indicates that . . . gasoline–range petroleum hydrocarbons have been present in the soil and groundwater on the [Fuel Terminal Property] in the immediate vicinity of the USTs" and that it is Schnabel's opinion that contaminated groundwater on the Fuel Terminal Property "could have migrated to the western portion of the [FRP Property]."  Id. at FRP014885. In reaching that conclusion, Schnabel relied on District Department of Environment (DDOE) files for the LUST case regarding the Fuel Terminal Property, which included a 2012 Phase II Environmental Site Assessment.  Id. at FRP014884–85.  Soon after receiving Schnabel's letter, Florida Rock, Hess, and Jemal's Buzzards Point executed a tolling agreement that tolls the statute of limitations starting on November 3, 2015.  See Am. Tolling Agreements [ECF No. 78-25] at FRP014880–83.

On February 28, 2018, Florida Rock brought this action against defendants for petroleum contamination that migrated from the Fuel Terminal Property onto the FRP Property, seeking damages under common law theories of negligence, private nuisance, and trespass, as well as

---

[1] Although many of the arguments in Florida Rock's surreply, as well as the accompanying exhibits, are not relevant to the Court's consideration of the pending motions for summary judgment, the brief does provide helpful clarification of Florida Rock's interpretation of certain documents, including its interpretation of the findings of the 2011 Schnabel Report.  Therefore, the Court will grant Florida Rock's pending motion for leave to file a surreply. See Pl.'s Mot. for Leave to File Surreply in Opp'n to Defs.' Mot. for Summ. J. [ECF No. 98] at 1.

injunctive relief under the Underground Storage Tank Act, D.C. Code §§ 8-113.01–113.12 (the "UST Act").  See Compl. [ECF 1] ¶¶ 1–6; see also Second Am. Compl. [ECF No. 24] ¶¶ 1–6, 33–69.  Defendants and third-party defendants have now moved for summary judgment on statute-of-limitations grounds.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007).

The party seeking summary judgment bears the initial responsibility of identifying portions of the record that demonstrate the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Anderson, 477 U.S. at 255.  The Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The nonmoving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial."  Morales v. Humphrey, 309 F.R.D. 44, 46 (D.D.C. 2015) (citing Fed. R. Civ. P. 56(c)).  If the non-movant's evidence is "merely colorable" or "not significantly probative," then summary judgment

may be granted.  Anderson, 477 U.S. at 249–50.  There is "no genuine issue for trial" where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Scott, 550 U.S. at 380 (quotation omitted).

## ANALYSIS

### I.  Scope of Issues Ripe for Summary Judgment

As an initial matter, there is some disagreement among the parties as to what issues are or are not ripe for summary judgment based on the discovery completed thus far.[2]  In December 2019, fact discovery regarding "the statute of limitations issue" was completed, and a schedule was set for defendants and third-party defendants to file "[a]ny motion to dismiss or other dispositive motion on statute of limitations grounds."  Second Am. Scheduling Order [ECF No. 64] at 1–2. All other fact discovery is ongoing and not set to end until November 2020, and expert discovery is likewise not set to end until April 2021.  Id. at 1.  Accordingly, the Court will not address issues beyond the statute of limitations, meaning it will not address the laches defense or Exxon's arguments related to contributory negligence.

Even still, throughout the discovery period, the parties have put forth competing interpretations of what is encompassed by "the statute of limitations issue."  Florida Rock contends that "the relevant inquiry was (and remains) when [it] knew or should have known that the contamination on the FRP Property originated from the Fuel Terminal Property."  See Opp'n to Mots. to Strike at 1.  Defendants argue that discovery was not so limited and was to be conducted as to "all facts and testimony relevant to the statute of limitations, including the evidence of

---

[2] For example, Florida Rock claims that defendants' laches defense, ExxonMobil's arguments regarding contributory negligence, and questions of fact regarding the migration of contamination from the Fuel Terminal Property cannot be decided at this stage because the parties have only completed discovery related to the statute of limitations defense.  See Opp'n Br. at 1 n.1, 6–7; Pl.'s Resp. in Opp'n to Defs.' & Off-Site Third-Party Defs.' Mots. to Strike ("Opp'n to Mots. to Strike") [ECF No. 89] at 1.  Defendants likewise argue that ExxonMobil's contributory negligence arguments are premature.  See Mem. of P. & A. in Supp. of Defs.' Resp. to Summ. J. Mots. by Third-Party Defs. ExxonMobil & Superior Concrete Materials, Inc. [ECF No. 77] at 14–15.

continuing migration of contamination." Reply Mem. of P. & A. in Further Supp. of Defs.' Mot. to Strike [ECF No. 95] at 1.

The Court will err on the side of caution and not decide any issues regarding the migration of contaminants from the Fuel Terminal Property because Florida Rock consistently communicated its understanding of the limited scope of discovery to defendants, and defendants agreed that the parties would not be able to complete full discovery of "migration-related issues." See Decl. of Joseph W. Rogan [ECF No. 89-1] ¶ 10 ("FRP agreed to produce information and respond to interrogatories about when FRP first learned about migration, but deferred discovery about the facts of migration itself."); Oct. 28, 2019 Email [ECF No. 78-7] at 1 (Florida Rock telling defendants that the "scope of . . . initial depositions is limited to when [Florida Rock] knew or should have known that petroleum contamination was migrating from the Fuel Terminal Property to the FRP Property"); Oct. 2, 2019 Email [ECF No. 89-4] at 1 (defendants stating "we agree that we will not be able to complete full discovery relating to all of the migration-related issues at this time, particularly if it is ultimately necessary to engage expert witnesses to opine on whether the alleged migration of contaminants from the Fuel Terminal Property to the FRP property is ongoing (or even occurring)").[3]

## II.   Statute of Limitations Defense

The defendants' and third-party defendants' motions for summary judgment all argue that Florida Rock's claims are time-barred. See Defs.' MSJ at 13–24; Third-Party Def. ExxonMobil's

---

[3] Because the Court will not make findings regarding the migration of contaminants from the Fuel Terminal Property to the FRP Property at this time, it need not consider Remy J-C. Hennet's declaration on the subject. Nonetheless, the Court will grant [83] defendants' pending motion to strike Dr. Hennet's declaration as inadmissible because Florida Rock admits that "[g]iven the status of the proceedings, . . . Drs. Hennet's and Andrews's declarations were not intended to constitute their expert reports or disclosures pursuant to Rule 26(a)(2)," and the declarations were "not intended to comply with Rule 702." Opp'n to Mots. to Strike at 15. Further, striking the declaration will not prejudice Florida Rock because it plans to file more comprehensive expert disclosures and reports in accordance with the Court's schedule. Id.

Mem. in Supp. of Mot. for Summ. J. on Statute of Limitations ("Exxon MSJ") [ECF No. 67-1] at

10–20; Mem. of P. & A. in Supp. of Third Party Def. Superior Concrete Materials, Inc.'s Mot. for

Summ. J. ("Superior Concrete MSJ") [ECF No. 71-1] at 3–10.

Florida Rock's common law damages claims are governed by the District of Columbia's

statute of limitations, which provides "for the recovery of damages for an injury to real property

from toxic substances . . . [within] 5 years from the date the injury is discovered or with reasonable

diligence should have been discovered." D.C. Code § 12-301(10); see Minkoff v. Clark Transfer,

Inc., 841 F. Supp. 424, 428 (D.D.C. 1993). Florida Rock's UST Act claim is for injunctive relief,

not damages, see Second Am. Compl. ¶ 58, and is therefore subject to the District of Columbia's

three-year catch-all statute of limitations that applies to actions "for which a limitation is not

otherwise specifically prescribed," D.C. Code § 12-301(8). As with the common law claims, the

statute of limitations on the UST Act claim "shall not begin to toll until the injury is discovered

or, with reasonable diligence, should have been discovered." D.C. Code Ann. § 8-113.09(i).[4]

"Under the discovery rule, a claim does not accrue until a plaintiff knows, or by the exercise

of reasonable diligence should know, of (1) an injury, (2) its cause, and (3) some evidence of

wrongdoing." Bradley v. Nat'l Ass'n of Secs. Dealers Dispute Resolution, Inc., 433 F.3d 846, 849

(D.C. Cir. 2005). A claim accrues as soon as the plaintiff has "either actual notice of her cause of

action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under

the circumstances in investigating matters affecting her affairs, such an investigation, if conducted,

would have led to actual notice." Diamond v. Davis, 680 A.2d 364, 372 (D.C. 1996).

---

[4] Florida Rock argues that the UST Act is an implementation of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992, which has no statute of limitations, and that the requirements of the UST Act cannot be less stringent than those under RCRA. See Opp'n Br. at 21. But there are specific statutory provisions and effectuating regulations requiring that a state program must be "no less stringent than" RCRA, none of which make any mention of a statute of limitations. 42 U.S.C. § 6991c(a)(1)–(7), (b)(1); see 40 C.F.R. §§ 281.30–43.

"Typically, reasonableness is a question for the jury," Phillips v. Fujitec Am., Inc., 3 A.3d 324, 329 n.16 (D.C. 2010), but the "question is appropriate for summary judgment" when "a reasonable jury 'can draw but one inference and that inference points unerringly to the conclusion that the [plaintiff] has not acted reasonably under the circumstances,'" Chicago Ins. Co. v. Paulson & Nace, PLLC, 783 F.3d 897, 901 (D.C. Cir. 2015) (quoting Starks v. N.E. Ins. Co., 408 A.2d 980, 982 (D.C. 1979)); accord Phillips, 3 A.3d at 330; Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union, 770 A.2d 978, 991 (D.C. 2001). "In the context of the discovery rule, it is the defendant's burden to show that the plaintiff has not acted with reasonable diligence." Kubicki on behalf of Kubicki v. Medtronic, Inc., 293 F. Supp. 3d 129, 158 (D.D.C. 2018).

### i.  When Florida Rock's Continuous Migration Claims Accrued

Defendants and third-party defendants ExxonMobil and Superior Concrete maintain that Florida Rock knew of its potential claims against the defendants no later than around February 2000. See Defs.' MSJ at 15–17; Exxon MSJ at 11–13; Superior Concrete MSJ at 5.[5]  Based on the uncontroverted evidence and Florida Rock's own admissions, the Court concludes that, no later than February 2000, Florida Rock had actual notice, or at least inquiry notice, of its claims based upon contamination migrating from the Fuel Terminal Property to the FRP Property.

---

[5] ExxonMobil and Superior Concrete also argue that Florida Rock had inquiry notice in 1986 when it failed to perform any environmental due diligence before acquiring the FRP Property. See Exxon MSJ at 13–16; Superior Concrete MSJ at 5–6.  Because the Court concludes that Florida Rock had notice in 2000, it need not (and does not) determine whether Florida Rock had inquiry notice even earlier—in the 1980s.  As a result, the Court also need not decide the motion to strike the declaration of Charles B. Andrews describing customary practices in real estate transactions in 1984 and 1986.  See Third-Party Offsite Defs.' & Defs.' Mot. to Strike the Decl. of Charles B. Andrews [ECF No. 84] at 1.  Florida Rock relies on this declaration only for the purpose of establishing that it lacked inquiry notice of migrating contamination when it purchased the property in the 1980s.  See Opp'n Br. at 47.  Accordingly, the Court will deny the motion to strike as moot.  See Teltschik v. Williams & Jensen, PLLC, 683 F. Supp. 2d 33, 44 (D.D.C. 2010), aff'd, 748 F.3d 1285 (D.C. Cir. 2014) (denying motion to strike declaration as moot when it pertained only to issue otherwise resolved by the court).

There is no dispute that, in late 1999, ECS conducted a Limited Phase II Environmental Site Assessment and Geophysical Survey of the FRP Property, which involved "geoprobe explorations and a field sampling laboratory testing program along the property boundaries adjacent to sites of potential environmental concern . . . to determine if any potential contaminants associated with the on-site and/or surrounding property use have impacted the subsoils and/or ground water beneath the project site." RSOF ¶¶ 21–22, 25.  In November 1999, before releasing the Phase II report, ECS employees had two phone conversations with their Florida Rock contact, Dan Sullivan.  Id. ¶¶ 23–24.  Sullivan's notes from the phone conversation state that "[g]roundwater is impacted by petroleum," "liabilities may involve both our own property and the Hess Oil property," and "[m]ost of the contamination is from Hess, and a little is from us. Some is from an unknown source." Id. ¶ 24.

ECS provided the results of the Phase II report to Sullivan on February 8, 2000.  Id. ¶ 22. The report included samples from six probes (P-1 through P-6) performed along the perimeter between the FRP Property and the Fuel Terminal Property, and all six probes revealed that there were petroleum odors in the soil and a visible sheen on the surface of the water samples.  Id. ¶¶ 26–28.  The highest concentration of total petroleum hydrocarbons in groundwater was found in probe P-6 and the highest concentration in soil in probe P-2.  Id. ¶¶ 30–31.  Both probes were near the border between the FRP Property and the Fuel Terminal Property.  Id.  The Phase II report concluded that "ground water and soils have been impacted from the current or former off-site petroleum storage (i.e. above and below-grade tanks) located on the Amerada Hess property," noting that "[t]he current and/or former tank fields appear to be situated in close proximity to the western [FRP] property perimeter, with petroleum contamination migrating onto the project site." Id. ¶ 32.

This Phase II report provided Florida Rock with actual notice, or at least inquiry notice, of its claims based upon contamination migrating from the Fuel Terminal Property because the report identified an injury (the contamination of soil and groundwater) as well as a cause and some evidence of wrongdoing (a petroleum storage leak located on the Hess Corporation's property). Cf. Vector-Springfield Properties, Ltd. v. Cent. Illinois Light Co., 108 F.3d 806, 807, 809–10 (7th Cir. 1997) (concluding that plaintiff's nuisance and trespass claims based on contamination from adjacent property accrued when plaintiff received letter stating that former gas plant was located on the adjacent property and "investigations at similar former gas plant sites have revealed contamination of soils and groundwater, in some cases well beyond the site boundaries"); Kohler v. Germain Inv. Co., 934 P.2d 867, 868–69 (Colo. App. 1996) (concluding that plaintiffs' negligence, nuisance, and trespass claims based on contamination from neighboring property's leaking USTs accrued when plaintiffs received report that "releases of petroleum products had impacted the soil and groundwater on plaintiffs' property and that the testing data implicated underground storage tanks on, or previously on, the adjacent properties as the source of the contamination"); SPS Ltd. P'ship, LLLP v. Severstal Sparrows Point, LLC, 808 F. Supp. 2d 794, 814–15 (D. Md. 2011) (abrogated on other grounds) (concluding that plaintiff had at least inquiry notice of nuisance and trespass claims when Phase I Environmental Assessment report stated that contamination from defendant's property "could be impacting" plaintiff's property).

Florida Rock argues that the Phase II report equivocated about the source of contamination, pointing to the report's assessment of contamination based upon probes P-13 and P-17. See Opp'n Br. at 35. Those probes were conducted where the former Opportunity Concrete facility operated on the FRP Property, and the report concluded that the "contamination in this area may reflect the former use of petroleum products or spills in the vicinity of the former Opportunity Concrete

facility[,] . . . the leaking of USTs or spills associated with the nearby Hess tank field[,] . . . upgradient and off-site migration of contamina[nts,] . . . [or] a combination of contaminants from possible off-site sources to the north and to the west."  RSOF ¶ 33.  Florida Rock also notes that the Phase II report didn't analyze the groundwater flow direction, and instead relied on "the assumption of unconfirmed conditions and topographic location" and assumed that the groundwater flows "in the south to southwesterly direction."  Opp'n Br. at 36.

Moreover, Florida Rock asserts that the Phase II report must be considered in the context of other ECS correspondence.  See id.  For example, the cover letter of the report stated only that contamination was "presumably . . . associated with the contiguous Amerada Hess Corporation Property, or another off-site source" and that further testing would be needed in order "to substantiate the assumption that there is an off-site responsible party."  Id.; see also RSOF ¶ 43.  Similarly, in the March 23, 2000 letter, ECS said that, "in order to substantiate the assumption that there is an off-site responsible party associated with the western and northern perimeter contaminants, additional testing . . . would be completed."  Opp'n Br. at 37 (quoting Mar. 23, 2000 Letter at DCM001795–98).

The Court, drawing all inferences in Florida Rock's favor, accepts that the Phase II report did not conclusively determine that contamination from the Fuel Terminal Property was migrating onto the FRP Property.  But that is not the standard for actual notice, much less inquiry notice, of a claim.  A plaintiff "need only have some knowledge of some injury."  Wagner v. Sellinger, 847 A.2d 1151, 1154 (D.C. 2004) (citing Colbert v. Georgetown Univ., 641 A.2d 469, 473 (D.C. 1994) (en banc)).  "[K]nowledge is deemed sufficient if the plaintiff has reason to suspect that the defendant did something wrong, even if the full extent of the wrongdoing is not yet known."  Id. (emphasis added).  The Phase II report provided just such "reason to suspect" wrongdoing,

identifying the Fuel Terminal Property, also known as the Hess Amerada property, as a likely source of at least some of the contamination on the FRP Property.  See, e.g., Mar. 23, 2000 Letter at DCM001795 ("The geoprobe evaluation and laboratory testing program performed along the western property perimeter revealed that ground water and soils have most likely been impacted from the current or former off-site petroleum storage (i.e. above and below-grade tanks) located on the Amerada Hess Corporation property.").

At minimum, Florida Rock had inquiry notice because, as it admits, "[Florida Rock] learned that there were many possible sources of contamination at the FRP Property in 2000, one of which was the Fuel Terminal Property."  RSOF ¶ 34 (Response).  In the District of Columbia, "the concept of inquiry notice under the discovery rule . . . means that a potential plaintiff may be legally accountable for investigating a possible claim before learning 'some evidence of wrongdoing.'"  Diamond, 680 A.2d at 389–90.  There is an "obligation to discover the discoverable."  Wagner, 847 A.2d at 1154.  Florida Rock could not ignore the Phase II report simply because there was some equivocation or because the consultants made certain assumptions in their analysis.  "Were the law otherwise, potential plaintiffs could manipulate the limitations period through the simple expedient of closing their eyes to what they suspect or even believe to be true."  Hubbard-Hall, Inc. v. Monsanto Co., 98 F. Supp. 3d 480, 496 (D. Conn. 2015).  "This concern is particularly salient in the context of toxic clean-up cases," where a plaintiff, "on notice of likely contamination, might rationally keep mum in the hope that regulators would never order it to remediate."  Id.

It is undisputed that ECS presented Florida Rock with the option to "[b]uild a strong case . . . to substantiate the assumption that there is an off-site responsible party."  Mar. 23, 2000 Letter at DCM001796.  ECS warned, however, that such investigations "present considerable cost

17

considerations" and "[t]here is no guarantee that these studies will identify a responsible party beyond a reasonable doubt."  Id.  Florida Rock argues that because ECS's assessment was speculative and further investigations would be costly, it made the "business decision" not to immediately attempt to identify the source of contamination.  Opp'n Br. at 37–38.

 "The discovery rule does not, however, give the plaintiff carte blanche to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."  Hendel v. World Plan Exec. Council, 705 A.2d 656, 661 (D.C. 1997).  "[T]he discovery rule," in addition to tolling the statute of limitations, "effectively creates a duty of inquiry."  Diamond, 680 A.2d at 389.  Florida Rock cannot sidestep that duty because it is inconvenient or costly; the question posed by the discovery rule is whether Florida Rock would have discovered its claims had it investigated with reasonable diligence—"not whether it was reasonable to delay any investigation."  Doe v. Am. Nat'l Red Cross, 923 F. Supp. 753, 760 n.11 (D. Md. 1996).

Hence, the Court concludes that, in light of the uncontroverted evidence and Florida Rock's own admissions, Florida Rock discovered or with reasonable diligence should have discovered its claims in February 2000 when it received the Phase II Report that identified the Fuel Terminal Property as a likely source of the soil and groundwater contamination on the western part of the FRP Property.[6]

---

[6] Florida Rock, in arguing that it did not have notice of its claims until 2014, explains that it received information in 2008 and 2011 that casts further doubt on whether the Fuel Terminal Property was in fact the source of contamination at the FRP Property.  See Opp'n Br. 40–44.  It appears that Florida Rock highlights these facts to explain only why it continued to lack notice of its claims, and not to argue that subsequent events, years later, somehow erased the notice that Florida Rock may have had in 2000.  For the sake of completeness, however, the Court notes that the email Florida Rock received in April 2009—which did not even provide Florida Rock with the September 2008 Environmental Site Assessment, but reported only that four soil samples taken from the western part of the FRP Property were mostly clean and within D.C. LUST soil quality standards—in no way eliminated the well-documented suspicion, supported by evidence in the 2000 Phase II report, that the Fuel Terminal Property may be the source of the contamination on the FRP Property.  See 2009 Whitney Email at FRP025177–78.

Nor did the 2011 Schnabel Report rule out the Fuel Terminal Property as a likely source of contamination.  To the contrary, the 2011 Schnabel Report identified the Fuel Terminal Property as a likely source (one of two likely

ii.    Florida Rock May Only Recover Damages from Injurious Acts Within the
       Limitations Period Immediately Preceding the Filing of this Action (or its Tolling
       Agreement)

Florida Rock contends that even if it had notice of its claims back in 2000, it is still entitled

to recover damages, or at least damages for injuries occurring within the limitations period

immediately preceding the filing of this action, because the tort is continuous.  See Opp'n Br. at

48–49.  For a claim to constitute a continuing tort, it must be "one that could not reasonably have

been expected to be made the subject of a lawsuit when it first occurred because its character as a

violation did not become clear until it was repeated during the limitations period, typically because

it is only its cumulative impact . . . that reveals its illegality."  See Keohane v. United States, 669

F.3d 325, 329 (D.C. Cir. 2012) (quoting Taylor v. FDIC,132 F.3d 753, 765 (D.C. Cir. 1997)).

In the District of Columbia, "[t]he concept is allied with the discovery rule."  Beard v.

Edmondson & Gallagher, 790 A.2d 541, 548 (D.C. 2002).  "The statute of limitations period for

continuing torts begins to run once a plaintiff has inquiry notice of a potential cause of

action."  Jung v. Mundy, Holt & Mance, P.C., 372 F.3d 429, 433 (D.C. Cir. 2004); see Beard, 790

A.2d 541 at 548 ("When the plaintiff is or should be aware that he or she is being injured by a

continuing tort, the statute of limitations begins to run.").  "But in the case of a continuing tort,

filing after the limitations period has run does not mean that there can be no recovery."  Jung, 372

F.3d at 433.  "Instead, '[t]he plaintiff then may recover only for injuries attributable to the part of

the continuing tort that was committed within the limitations period immediately preceding the

date on which suit is brought,'" or in this case, the date on which the tolling agreement became

---

sources) of the contamination on the FRP Property.  See Pl.'s Surreply at 4–5; see also 2011 Schnabel Report at
FRP025459.  Thus, the information that Florida Rock received after 2000 does not change the fact that the 2000 Phase
II report put Florida Rock on actual or inquiry notice of its claims against defendants and that the statute of limitations
for those claims has run.

effective.  Jung, 372 F.3d at 433 (quoting Beard, 790 A.2d at 548).  "[T]he part of the continuing

tort that was committed within the limitations period" preceding the filing of the suit cannot be the

"lingering effect of an unlawful act nor a defendant's failure to right a past wrong," but must

instead be "injurious acts."  Lin v. United States, 690 Fed. App'x 7, 9–10 (D.C. Cir. 2017), cert.

denied, 138 S. Ct. 207 (2017).

Here, the continuous tort doctrine does not toll the statute of limitations because, as the

Court has already explained, Florida Rock was on notice of the likely migration of contamination

from the Fuel Terminal Property onto the FRP Property as early as February 2000.  The statute of

limitations on those claims expired in 2003 (UST claim) and 2005 (common law claims).

Nonetheless, even though Florida Rock has filed this action "after the limitations period has run,"

Jung, 372 F.3d at 433, it may still recover for injuries attributable to subsequent injurious acts

committed within the limitations period prior to the date on which it brought suit.  Here, because

the suit is construed as being filed on November 3, 2015, pursuant to the parties' tolling agreement,

that means that, for its common law claims, Florida Rock may recover for any injurious activity

that occurred after November 3, 2010 (five years prior to the effective filing of the action), and for

its UST Act claim, Florida Rock may seek relief for any injurious activity after November 3, 2012

(three years prior).  See Am. Tolling Agreements at FRP014880–83 (tolling statute of limitations

starting on November 3, 2015).

At this stage, the Court does not have a sufficient record before it to evaluate whether

defendants engaged in repetitive injurious conduct between 2010 and 2015, as discovery relating

to that subject is not yet complete.  Facts related to the migration of contaminants, as well as the

defendants' conduct and knowledge after 2010, may be relevant because "[w]hether [the

defendants'] alleged acts may be considered a new occurrence or simply the continuing ill effects

of a prior occurrence is dependent on the nature of the wrongful conduct and harm alleged under the particular cause of action." McCray v. Hous. Auth. of Baltimore City, No. CV RDB-18-2271, 2019 WL 4120750, at *6 (D. Md. Aug. 29, 2019). "[T]here is no single, all-inclusive rule . . . [and] each case must be decided on its specific facts." Beatty v. Wash. Metro. Area Transit Auth., 860 F.2d 1117, 1125 (D.C. Cir. 1988).

"[T]he mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for that is the purpose of any lawsuit and the exception would obliterate the rule." Fitzgerald v. Seamans, 553 F.2d 220, 230 (D.C. Cir. 1977). Nevertheless, omissions may, in certain circumstances, constitute injurious acts when there is an affirmative, ongoing duty to act. See, e.g., AKM LLC dba Volks Constructors v. Sec'y of Labor, 675 F.3d 752, 757–58 (D.C. Cir. 2012) (recognizing certain statutory violations where "the dangers created by the violations persist" and thus involve recurring injurious acts); Beatty, 860 F.2d at 1122 (explaining that "[a] temporary or continuing nuisance is one which is 'abatable,' or . . . intermittent or periodical," such that "a new cause of action arises with each new invasion or injury"). [7]

Cases applying these principles in circumstances similar to those here further confirm the fact-intensive, context-specific nature of the inquiry. See, e.g., Ford v. Maryland Attorney Gen., No. 17-cv-2525 (ABJ), 2018 WL 5251742, at *2, 6–7 (D.D.C. Oct. 22, 2018), aff'd, No. 18-7175, 2020 WL 1443537 (D.C. Cir. Mar. 12, 2020) (concluding that the fact that plaintiffs "continue[d] to be affected" by the migration of toxic chemicals from a 30-year-old gas leak is akin to a

---

[7] Many cases discuss whether a tort offense is "continuous" in the context of whether to toll the statute of limitations—a question this Court has already answered. The Court relies on these cases solely for their analysis of whether an offense involves recurring injurious acts, or instead, involves one act with ongoing, often latent, harmful effects.

"lingering effect of an unlawful act" or "defendant's failure to right a past wrong"); Nat'l Tele.
Co-Op. Ass'n v. Exxon Corp., 38 F. Supp. 2d 1, 5 (D.D.C. 1998) (finding an "injurious act" within
the statute of limitations period because "[n]ot only d[id] the gasoline continue to migrate across
the property line, but [plaintiff] . . . produced evidence that [within the limitations period] Exxon
did not remove its leaking UST"); see also First Virginia Banks, Inc. v. BP Expl. & Oil Inc., 206
F.3d 404, 406–07 (4th Cir. 2000) (distinguishing between cases where migration of contaminants
occurs in distinct episodes, each giving rise to separate causes of action, and cases where migration
has occurred continuously throughout the decade).

 "As is evident from these few examples, the distinction between continually recurring
violations and continuing effects can be subtle." McCray, 2019 WL 4120750, at *7.  Here, Florida
Rock suggests that the clean sampling results from the September 2008 Environmental Site
Assessment call into question whether Florida Rock was injured by tortious acts and omissions
before February 2000, after September 2008, or some combination of the two.  See Opp'n Br. at
50.  Similarly, Florida Rock speculates that the removal of the USTs in 2007 may have caused the
release of contaminants.  Id.[8]  To be clear, it is Florida Rock's burden to identify injurious action
within the limitations period that caused it harm.  However, because the parties have not completed
discovery on relevant facts, the Court cannot dismiss plaintiffs' claims on summary judgment at
this time.

Hence, the Court will grant in part and deny in part defendants' and third-party defendants'
motions for summary judgment.  The Court concludes that, by no later than February 2000, Florida
Rock had at least inquiry notice of its claims based upon the migration of contaminants from the

---

[8] It is unclear if Florida Rock is suggesting that the contamination that allegedly migrated from the Fuel
Terminal Property to the FRP Property was caused entirely by defendants' post-2000 conduct.  That allegation appears
inconsistent with Florida Rock's theory of the case; moreover, there is no evidence in the record to establish that
contamination from the Fuel Terminal Property did not begin migrating onto the FRP Property until after 2000.

Fuel Terminal Property to the FRP Property.  Accordingly, Florida Rock cannot seek relief for any injuries caused by the migration of contaminants outside the limitations period.  Florida Rock may seek relief only for injuries caused by wrongful conduct within the limitations period.  On that issue, discovery is ongoing and summary judgment thus is inappropriate at this time.

## CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part defendants' and third-party defendants' motions for summary judgments on statute of limitations grounds. Additionally, the Court will grant defendants' motion to strike the declaration of Remy J-C. Hennet; deny as moot the defendants' and third-party defendants' motion to strike the declaration of Charles B. Andrews; and grant Florida Rock's motion for leave to file a surreply.

/s/
JOHN D. BATES
United States District Judge

Dated:  August 10, 2020

23